Table of Contents for Exhibits

Transcript of Defendant's Exhibit E: 4/25/17 Disciplinary Hearing (Plaintiff's A).......................1

Affidavit of Lyle VanNahmen.................................................................................32

VanNahmen Deposition pp. 180-181........................................................................35

VanNahmen Deposition Ex. 7.................................................................................37

ECF Document 1-6 Final Disposition Letter...............................................................39

ECF Document 1 p.8............................................................................................41

VanNahmen Deposition pp. 185-186........................................................................42

ECF Document 1-5 Memorandum.............................................................................44

PLAINTIFF'S EXHIBIT A:
Transcript of Defendant's Exhibit E; 4/25/17 Disciplinary Hearing

**0:00**

Okay I want to welcome everybody, thank you for being here.  This is a formal conduct review hearing for Lyle VanNahmen.  It's Tuesday, April 25th 2017.  The hearing was scheduled to begin at 1:00 p.m. and we're starting at 1:21 p.m.  I want to thank all of you for arriving on time or a little early and I want to note for the record that Mr. VanNahmen was delayed

**00:30**

until just now at 1:21 p.m. that's why we're starting a little bit late.

First thing I would like to do is ask if you would Lyle if you would turn to page on that code of conduct on page 77, that's where it starts and if you would turn first of all to page 82, on page 82 right down at the bottom of the first

**1:00**

para first column it says "college's rights" at the bottom of the first column and it says "record" second paragraph: "the college reserves the right to record the hearing and keep records on file" so what I wanted to notify you of is that Betty Ann South has started a recording on an iPad and also we have a backup recorder here and then I also believe there is another recording.  Have you activated it as well?

Yes.

by Mr.

**1:30**

Antosh so certainly I wanted you to be aware that recording was happening and that the audio recording will become a permanent part of your conduct records just like the written things that are entered into evidence in this hearing.

The next thing that I wanted to note for the record is we want to do introductions of everybody that is in the room.  If you're a college staff member or employee if you could state your name and your title

**2:00**

and if you're a student if you could state your full name and then let us know whether you're a freshman or a sophomore or what your major is that would be helpful.  And then if you're in the room serving as an advisor if you could state your name full name and indicate whom you're serving

**1**

as an advisor or your title if you're affiliated with the college.  We will start with Steven Sites.

2:30

First for the record I just want to let everybody know that I'm here representing the college.  I'm off duty right now with the highway patrol so I'm out here representing the college patrol, this is college business only.  Steven Sites security coordinator

Stephanie Lanning, dean of students.

Carla Patee, executive assistant to the president.

Lawana VanNahmen, wife of Lyle VanNahmen.

Did we have notification that she was attending?

3:00

We were supposed to have any attendees notified in writing

I'll let her know that she may or may not be able to attend so if you want to exclude her...

Okay I apologize but we were supposed to have been notified if anyone was coming to the hearing on behalf of Lyle so okay what I want to do

3:30

is I want to halt the hearing at 1:24pm we'll take a short break I want to speak with an advisor, we'll be right back.

Do you want me to stop?

Yeah stop the recording.

Are you back on?

Yes.

Okay we'll resume the hearing at 1:26pm and we'll continue by introductions.  We will permit you to attend the hearing

4:00

go ahead and introduce yourself.  Lawana VanNahmen Spearville Kansas wife of Lyle VanNahmen.

**2**

Alright thank you.

Harold Nolte Dodge City Community College president.

Monica Malley resident life operator and student activities coordinator.

Jana Holwerta dean of academics, Dodge City Community College.

Peter Antosh lawyer for Lyle VanNahmen.

Glenn Kerbs college attorney.

Paul Young professor of economics.

Lyle VanNahmen.

<div align="center">4:30</div>

And are you a freshman or a sophomore status and what is your major?

I was a returning I graduated some time ago from Dodge City I was a returning student trying to seek another degree.

And what are you seeking?

Well I get in the medical feel or something like that.

All right thank you.

Josh Thompson director of security.

Betty Ann South admissions assistant but here as a recorder.

Okay I'm Beverly Temaat Beverly Temaat

<div align="center">5:00</div>

vice president of student affairs and risk management and for the purposes of this hearing I'll be serving as the chief judicial officer.  Thank you everybody for introducing yourself.  We're going to move on Lyle with what I consider to be some technical procedures that we read into the record and there are actually three parts to this hearing and I'll kind of go through that in a minute so the first part we'll just be reading into the record things that I think you have already been provided

<div align="center">5:30</div>

or your attorneys have been provided previously.  So one of the things that I want to point out has

<div align="center">**3**</div>

already occurred.  Lyle if at any time you want to speak directly with your advisor Mr. Antosh all you have to do is just let me know you'd like a break and we'll stop the recording.  We'll halt the hearing and you're permitted to go and speak with Mr. Antosh, you can go outside the room and

6:00

take as long as you would like to get advice and then we will re-start when you re-enter so all you need to do is just let me know and we'll take a break right away, okay?

Very good.

And then the other thing if anyone else needs a break or you need a break Lyle please let me know and we can take a break if anyone needs to.  And those of you that are not familiar with the student union, the men's restroom is this way and the women's is this way

6:30

and we can take a break at any time.  Okay are you ready to get started?  Okay first of all on the bottom of page 82 I wanted to note that "presence of an attorney" at the bottom of page 82 on the left column.  "The college shall have the right to have an attorney present for advice" and that's why we have Mr. Glenn Kerbs here representing the college.  "Prior restrictions"

7:00

at the top of the column.  "The college reserves the right to implement any student sanction or restriction of records on an interim basis prior to a hearing" and so that's why I wanted to explain you do have some interim sanctions that were given to you earlier that were suspension from the college and trespass from the campus and that was on a temporary basis pending the outcome of this hearing and so

7:30

I wanted you to know why that was done, according to our policy, based on an interim basis.  Okay the other thing that I wanted to read into the record is on page 82 and it's about one two three four there are four paragraphs in the same column.  The first column it says "presence of an attorney or advisor.  The student may have an attorney or advisor present.  The role of the attorney or advisor

8:00

is limited to advising the student.  The attorney or advisor may not directly question witnesses or the judicial hearing board.  Should the advisor or attorney interfere with the procedure of the conduct review hearing, the college reserves the right to exclude them from the hearing.  Students who wish to have an advisor or an attorney present must notify the judicial hearing board in writing at least 24 hours in advance.  Such notice

8:30

**4**

must include the name and address of the advisor or attorney as well as an authorization.  So one of the things that I did want to note for the record is that Mr. Antosh did notify us in writing that he would be here serving in the capacity of an advisor and that has been approved well in advance of the time-frame that was required.  Okay does anyone at this point have any questions?

<div align="center">9:00</div>

Mr. VanNahmen do you have any questions?

I have a quick question this is Pete Antosh.

Okay I'm sorry Mr. Antosh but we normally don't take questions from the advisors.  If you want us to stop the hearing and then ask the question we can do that, but actually in the proceedings we normally don't take questions from the advisors.

Okay that's fine.

Do you want to stop?

No.

Do you want to proceed?

I'm gonna.

Do you want to confer with your

<div align="center">9:30</div>

Mr. VanNahmen?

I'm just gonna hope that you answer the question, if you don't answer the question in the course of the proceedings then I'll try to take a time out.

Sure okay that sounds good.  Alright if you look on page 81 it says procedures for conduct review hearings.  "Dodge City Community" about halfway down on the right column "procedures for conduct review hearings,

<div align="center">10:00</div>

Dodge City Community College formal conduct review hearings are to be conducted so as to ensure fairness to the students charged with violations of the code of conduct.  Formal rules of evidence are not to be applied.  The dean of students or his her designee serves as the judicial hearing board administrator at conduct review hearings.  The college convenes a special judicial hearing board

<div align="center">**5**</div>

comprised of representatives from any combination of faculty staff and administration

10:30

in order to proceed with the conduct review hearing so I wanted to note for the record that our hearing panel is made up of a college staff member a college faculty member and a college administrator in accordance with our normal procedures, and they have introduced themselves. Okay.  So next up I wanted to explain the parts of the conduct review hearing so that you would understand Lyle

11:00

kind of what's going on.  The first part is probably maybe somewhat a little bit frustrating to you because we're going to be reading a lot of things into the record.  I'm going to be talking a lot other people are going to be talking and that's us presenting the evidence that we have that led us to this conduct review hearing.  The next part is probably the most important part of the hearing and that's your opportunity to tell your side of the story

11:30

and to present evidence that you may have or information that you think we didn't have or the hearing panel has and it's very important for your due process rights, and you have the opportunity to present all of that, and we'll be here for as long as you would like to present that kind of information. But again I do think it is important when we're having witnesses give a statement which you already have the written statements or they're giving verbal

12:00

testimony if you want to write down notes that kind of thing you do have the opportunity later in the hearing to ask them questions about their statements or things that you do not understand, so I know it'll be a little frustrating listening for a while, but I do want you to know that you have that opportunity and that is actually the main part of the hearing, your opportunity to tell your side of the story.  Because what'll happen is there's a

12:30

number of sanctions that are listed in the code of conduct that could be put into place as a final sanction.  We most likely will be modifying your temporary sanctions.  And all of those sanctions are outlined in the code of conduct that you and your attorney were given.  So, take notes, do whatever you would like as far as presenting, asking questions, and again, the hearing panel and the rest of the people in the room will stay here

13:00

as long as you would like because that is the most essential part of this hearing, okay.  And then the third part, when we're all finished, and you're finished presenting your information to the hearing

**6**

panel, the hearing panel does go into deliberations and they make a decision related to whether or not they will modify this sanction, revise it, throw it out, whatever.  But I do think one thing that is usually important in my

13:30

experience in working with hearing panels that you might want to think about, usually they want to know what your academic goals are for attending the college.  I heard you say a few minutes ago that you're considering another career so I think that kind of thing what your goals are, generally hearing panels want to hear some of those kinds of things so that they know what your intention is if you continue here as a student.  Okay?  So those are just

14:00

some things that they may ask you about or you may want to offer.  But certainly anything else that you think is relevant please provide that for all of this okay.  Alright any questions thus far?  If, like I said, you need a

14:30

break at any time or you want to confer with Mr. Antosh please stop me, we'd be happy to take a break and you can do that and then if any other member here would like a break please let us know. Okay I'm gonna like I said I'm gonna read some things into the record and then we'll go from there and we will call some witnesses.  And you do have a right to ask questions of those witnesses when we get to your part, okay.  Alright first I wanted to read into the record a letter that was issued on December the 10th

15:00

from dean Stephanie Lanning and it says "This letter is to confirm in writing that you've been placed under temporary sanctions pending a conduct review hearing due to a reported violation of the student code of conduct behavior, misconduct on campus.  You'll be notified as to when your student code of conduct hearing will take place.  This is a formal written warning" and then the first one says "Effective immediately you've been temporarily

15:30

temporarily I apologize trespassed campus-wide with only one exception noted below at number two.  If you are observed on the Dodge City Community College campus or at any Dodge City Community College events our security staff will be called and you may be subject to immediate removal from campus and arrested for criminal trespass" and it cites the KSA statute "specifically Dodge City Community College security will notify law enforcement officers

16:00

from the Dodge City Police Department or the Ford County Sheriff's Office that you are violating

a trespass sanction and you may be subject to immediate arrest for trespass.  Number two you are only permitted to attend your final exam for the A and P 1 course you are currently taking.  You may only enter the science and math building to complete the exam.  Your final is scheduled for Monday December 2nd."   And then

16:30

it says that information regarding the statute can be found in the Dodge City Community College calendar handbook and it gives you the phone number and it says if you have further questions please call Stephanie Lanning, dean of students, and then it gives her phone number and then her signature.  I just wanted to double check do you recall receiving this letter?  Okay.  And I'll pass the letter to the hearing panel members so you can also read it.

17:00

The next letter is on March the 5th of 2017 it's addressed to you and says "please accept this letter as written confirmation that a formal disciplinary hearing has been scheduled for Wednesday March 8th at 1:00 pm in the Ford County Room in the student union upper level, on the campus of Dodge City Community College. The purpose of the disciplinary hearing is to determine your alleged involvement and violations of the DCCC code of conduct.

17:30

These specific allegations are that you violated conduct expectations noted in the behavior misconduct page 78 and assault page 80 sections of the code of conduct on or about December 5th and on or about December 8th 2017.  Specifically the charges are as follows..." and then it lists behavior misconduct on page 78 and it states direct quotes from the behavior misconduct

18:00

in the code of conduct.  But I wanted to note that not all provisions of the behavior misconduct apply to this situation and instead there are specific phrases that are bolded and underlined that do apply. Those that are not bolded or not underlined do not apply to Mr. VanNahmen's situation.  Behavior misconduct states "students are not to exhibit behavior that threatens any person or conduct themselves in a

18:30

disorderly manner."  So it was behavior disorder that was threatening to a another person and then conducting themselves in a disorderly manner.  On assault page 80 again the same provisions apply only those that are underlined apply to Mr. VanNahmen and that would be any actual or threatened interference and then down below "intimidation

19:00

against any member of the college community is forbidden."  Of special note it says "only the

**8**

underlined and bolded provisions of each code of conduct section are included in the allegations and charges that were specifically related to this conduct hearing." Okay it says according to the code of conduct students can be held responsible for their behavior on or off campus.

According to the handbook code of conduct page 77-88 Dodge City Community College reserves the right to impose

19:30

disciplinary sanctions for failure to comply with the code of conduct and other policies and it says "based on the previously stated charges above it says effective on December 10th you were temporarily trespassed campus wide" with only the exception that we had noted before to attend your final and then you were notified trespass statutes. Again I want to read into the record on number two you were permitted to attend your final exam for the A and P

20:00

one course you were taking in the Fall 2016 semester. You were permitted to enter the science math building to complete your exam that was scheduled by Professor Scott Thompson on Monday December 12th from 7:00 pm to 9:30 pm. For the record we are not aware of any violations on your part of your temporary trespass sanction that have occurred since December 10, 2016 and the date of this letter. I am also not

20:30

I want to note for the record I'm not aware of any other trespass problems or violations related to this. Is there any person present aware of any? Okay, hearing none we'll move on. It says your please review the DCCC code of conduct prior to your hearing in order to be familiar with provisions and procedures. If you have any questions please contact and then it gives my name and number or ask your attorney to contact

21:00

Glenn Kerbs and it gives Mr. Kerbs' contact number. Okay after after that date I do believe that you had an attorney and then changed attorneys and so you were notified in each time and we had a delay in the hearing date at the request of, I believe, Mr. Antosh was the second one so that he would have a chance to review the materials

21:30

we had provided previously, and so a new contact date and time was set with a date that was available to you and your attorney and those that we needed to have present and that's today and it was at 1:00 pm and I believe that was communicated from Mr. Kerbs to your attorney so again I appreciate everybody's participation here and I appreciate you being here because it is very important for your future status as a student at the college.

**9**

<div align="center">22:00</div>

Alright do you have any questions thus far?  Anyone else?

Okay one of the things that I hope that we can get to right away is we will start calling our witnesses related to a couple of incidents that led to us all being here that we believed were violations of the

<div align="center">22:30</div>

 code of conduct on your part and that's why we put the temporary sanctions in place.  First witness that I would like to call is dean Stephanie Lanning.

Okay Dean Lanning can you go ahead and proceed and tell us your involvement related to these incidents?

You want me to read my statements?

<div align="center">23:00</div>

That would be fine you can read it or you can give a verbal or both.

Okay on Monday December 5th 2016 at 1:00 pm Lyle came into my office wanting to know if the college was selling its land along Fourteenth Avenue for retail development.  I explained to him that the college was not currently selling the land but that there was an informational meeting held on Tuesday November 22nd 2016

<div align="center">23:30</div>

with Dodge City economic development to discuss the option.  I also told him that a board meeting was scheduled for Monday December 12th 2016 at 6:00 pm.  At this board meeting the board would decide if they were interested in looking into selling the land or not but that it was not a done deal. He asked if President Nolte was the one to make the decision to sell the land.  I told him it was not the president's decision that it was the board of trustees' decision.

<div align="center">24:00</div>

He stated he wanted to visit with the president.  I told him that he needed to schedule an appointment with Carla Patee executive secretary to the president if he wanted to visit with the president.  He also wanted to know what my opinion on the matter was.  I told him that my opinion was personal.  At 3:00 that day 3:00 pm on Monday December 5th in cabinet I updated the president on the conversation I had with Lyle VanNahmen;

<div align="center">24:30</div>

he stated he had met with him just before cabinet meeting.  Then on Thursday December 8th 2016

<div align="center">**10**</div>

at 8:30am Lyle VanNahmen came into student services.  I noticed him walking in front of my office and around student services but I had someone in my office at the time.  He then sat down at one of the admissions reps' desks and they handed him a piece of paper and a pencil.  I came out of

25:00

my office and asked Lyle if he needed assistance.  He stated he just needed a piece of paper and a pencil to write a letter and that it was given to him.  I asked if he needed assistance from the admissions rep.  He said no so I moved him into the Coronado Room to write his letter.  When I did this he asked how to spell Dr. Nolte's name.  I asked him if he needed any other assistance; he stated no.  At this point I came back to my office called security as well

25:30

as Carla to give them the heads up that Lyle was in the building.  Lyle then came to my office and requested that security follow him to witness the signature.  Steven Sites and Brandon Olive walked in and I asked them to witness the signature.  I asked Lyle what signature he needed.  He hesitated and then stated he did not want me to know, to keep me out of the situation.  Lyle, Steven and Brandon exited then exited out the west door.

26:00

On Friday December 9th at 8am 2016 at 8am I was informed by Beverly Temaat vice president of student affairs that Lyle VanNahmen requested the president's resignation immediately for his involvement in selling the college property.  At this point and as the dean of students I temporarily trespassed Lyle from camp Lyle campus-wide except for his final exam in A and P 1

26:30

for behavior misconduct.  I gave the letter to Beverly Temaat to give to security to deliver to Lyle.

Okay.  And is this a copy of the letter that you wrote to be delivered to Mr. VanNahmen?

Correct.

Okay and then can you talk just for a minute about the way the letter was returned?

So in

27:00

usually what happens when a student is placed on temporary sanctions or sanctions we have the security officers deliver the identification to them.  I give them two copies, one for the student to keep and then one for the student to sign and return to me, and then I did get the one returned to me not signed by Mr. VanNahmen but it had a

27:30

**11**

statement ready written on the letter.  Would you like me to read the statement on the letter?

Yeah go ahead and read the statement on the letter back too.

Okay.  So the letter that I should have gotten back signed stated that "refused as I stand against the" I can't read the word.

<div align="center">28:00</div>

I can't read them "cause it's over actions of those Dodge City College Community College."  At the bottom it says "Stephanie in your failing to stand up for the Dodge City Community College the faculty and the students you should quit resign yourself.  Lyle VanNahmen."

Okay.

On the back it says "I stand against the ruination of Dodge City Community College

<div align="center">28:30</div>

fully by Dr. Nolte" and then he signed it "Lyle VanNahmen."

Okay may I see that just for a minute?  Lyle do you recognize the writing that is over top of the letter,  is that your writing?

Yes they asked me to sign it when they handed it?  You're asking me a question, the one thing is is it says December the 10th and this was handed to me December the 12th you recognize that right?

Yes

<div align="center">29:00</div>

we do.  The reason why I handed that to you is that Dean Lanning wasn't able to read part of the writing there so I was wondering if you could tell us exactly what this part says.

"Unethical I feel the way the college is being run is unethical" is what I tried to say.

What are these words right here?

Unethical unethical its unethical okay actions of the...

Okay. Okay

<div align="center">29:30</div>

and then what is that word?

<div align="center">**12**</div>

And that word the those that run run Dodge City Community College.

Okay.  I just wanted to make sure that we were reading the words correctly thank you.  Alright Dean Lanning is there anything at this point that you would like to add?

No.

Is there any members of the hearing panel that have a question for Dean Lanning?

<div align="center">30:00</div>

Or we can call her back up as well.  Not at this point, okay.  Thank you.  And you do have when we get to your part the right to ask any of the witnesses back up and ask them questions okay here in a few minutes.  Alright, next up I'd like to call President Harold Nolte as a witness.

<div align="center">30:30</div>

President Nolte thank you for being here I know you have a busy schedule.  I understand that you were going to give us a verbal report of what occurred in your office in your interactions with Mr. VanNahmen.  So please proceed you can read a statement that you had provided or you can provide verbal comments whichever you're comfortable with.

I think I remember quite well.

<div align="center">31:00</div>

Let me give you a little background on my career.  I've been in education higher education for 37 years.  My I've also been a I've also been on the other side of the fence.  I was a vice president a dean as well as vice president for student services and also athletic director for 23 years.  My degree is in counseling, and my doctorate is also in education leadership.  Along that is also in psychology my background is sociology,

<div align="center">31:30</div>

psychology and so I am aware of the situation and what happened in my in my recalling is Mr. VanNahmen came into my office.  I had never met the gentleman before, he came in somewhat friendly, so I invited him into the office.  The sun was out and so we he was having trouble with his

<div align="center">32:00</div>

with seeing with seeing me and so we went ahead and closed the blinds.  I asked him if that was okay he said that was fine so we went ahead and closed the blinds.  We talked a little bit about Spearville about the community and that I recently understand that he's from there and so we talked a little bit about that and then quickly that conversation changed very very quickly.  He asked me

<div align="center">32:30</div>

<div align="center">**13**</div>

about whose stupid idea was the retail development and I said well it's the city and the developer and I was just presenting that information to the board.  And I really don't have a decision in that. He quickly got upset with me and said "the board is old and stupid.  If this is your idea you need to resign."  And he quickly tried to

33:00

I guess find paper and I basically said he asked me to resign right there at that time and I informed him, it was a quick conversation, I was concerned about my safety I'll be honest with you I really was cause he got pretty upset about it and I felt like I needed to talk him off the ledge.  It was pretty intense but finally he got up and he Mr. VanNahmen got up and

33:30

left and so I quickly after that I was a little bit concerned.  I think my assistant realized my concern and out of thirty seven years of doing being everything from student activities director to a president for three different schools I was concerned.  And I've been a discipline officer and

34:00

done a lot of these things for different places but I was concerned about my welfare I really was, and sir you did scare me very much.  And so I went ahead and talked to Keith and I think Josh and others and that is the reason why we have moved security downstairs.  Because of because of that incident. And I worried about my welfare and I've even thought about doing some

34:30

things at my home because of because of you know I was in Spearville one weekend and I thought "oh my gosh here I am."  You do, you do have that tendency to scare people.  And that's my that's my story.

Okay.  Is there anything anyone would like to ask him at this point, anything else that you would like to add?

Other than this is this is a opportunity for the for our board

35:00

we don't know what's gonna happen but my job as a college president is to offer opportunities for the college for doing all sorts of different things.  Offering programs opportunities as far as development for example like nursing programs or any of our programs this is what I do as a college president I talk to the board I'm not the one to do to bring I present them the programs so thank you very much.

Okay

35:30

was any resignation letter ever directly presented to you or it was just referred to that he asked you to resign?

I actually Mr. Sites showed me the letter which...

You got it and I have a copy of that and we'll have Mr. Sites talk about that and others.  Okay anything else you'd like to add"

That's it.

Okay thank you.

Okay next up I'd like to call Carla Patee.

36:00

Okay Carla just go ahead and you can also read your written statement or make other comments whichever you would like.

Okay on Monday December 5th Mr. Lyle VanNahmen entered my office asked to speak with Dr. Nolte.  Dr. Nolte at that time was in a meeting in his office and not available.  Mr. VanNahmen said that he needed

36:30

to run back upstairs and would be back.  He returned later and waited on Dr. Nolte.  Dr. Nolte met Mr. VanNahmen in the president's office with the door closed.  The president's door opened later and Dr. Van excuse me Mr. VanNahmen left.  Dr. Nolte was noticeably shaken and immediately went to find Mr. Thomas.  Both were

37:00

in my office and Dr. Nolte relayed his information to both of us.

Okay anything else you'd like to add, any hearing member panels have any questions?  Okay thank you.

Next up Mr. Steven Sites and I think you have a incident report to read into the record and then you can add anything

37:30

else that you would like to add as you go.

**15**

Okay.  This is gonna be my incident report case no. 16-055.  You want me to go ahead and just read off my report?  On 12/7/16 I was talking with security director Josh Thompson.  He was telling me about a gentleman by the name of Lyle VanNahmen who went into Dr. Nolte's office and either

38:00

pulled down his window blinds or attempted to pull down the window blinds.  From what I understand is that VanNahmen was trying to get Dr. Nolte to resign.  On 12/8/16 I was talking to Sharon Campbell when I noticed VanNahmen walk into the student union.  He looked like he was lost.  As soon as I noticed him I went down to Dr. Nolte's office to let him know he was in the building.  When I went back upstairs I noticed VanNahmen was talking with one of the admission reps asking for a piece of paper

38:30

and pen.  Once he had the paper and something to write with he started to look for somewhere to write.  Stephanie Lanning made contact with VanNahmen told him he could use the conference room to write.  I was standing with Stephanie Lanning when VanNahmen was finished writing on the paper he was wanting to go to the president's office.  I then told VanNahmen that the president was pretty busy but I would go downstairs with him.  We went down to the president's office.  I had VanNahmen wait outside while I went see if the president was able to speak with him.  Dr. Nolte was busy so I took

39:00

VanNahmen to the conference room asked him what was up.  He explained to me that he was not happy with what the president was doing and was wanting him to resign.  I then asked him if I could give the president his letter and he stated I could but he wanted copies of it and I was to be a witness.  I then explained to him that it could be a while before the president was free and I offered to call him if the president could to fit him in to talk.  VanNahmen stated that that would be fine.  I was able to give the president the letter and confirmed he was gonna be busy all day.

39:30

On 12/10/16 I'm noticing some of our dates are off a little bit so I was asked by doc or director Thompson and Bev Temaat to give a trespass letter to VanNahmen.  I was able to.

Excuse me that was the first day you were asked to deliver 12/10.  That's okay there was just a delay in delivering it.

I was able to make contact with VanNahmen via phone and asked if asked him if he was still in Dodge City.

40:00

He stated he was not and wanted to know what was going on.  I told him I had a letter that I needed

**16**

to get to him and he made the comment "well I must be in trouble." I asked him if he'd please call me and let me know when he would be back up to the college. VanNahmen stated he would. I called and talked to Bev and she stated she wanted me to go to Spearville and give him the letter at his house. I and Brandon Olive were on our way over to Spearville when I noticed a blue passenger car pass us, the driver looked like VanNahmen. I then

<div align="center">40:30</div>

tried to call VanNahmen back to see if he was still at home and he did not answer, we did not get an answer. We turned around and headed back towards the college. We were able to catch up to the blue passenger car once it pulled into the college north parking lot. I noticed VanNahmen get out of the car. We made contact with VanNahmen and gave him the letter. he read the letter and just looked at us. I asked him if he would sign the other copy just to show we hand delivered it to him and he stated he did not want to. I told him that was fine

<div align="center">41:00</div>

and we would just write refused on it. VanNahmen did in fact write refused on it plus some other stuff see the letter along with asking for Stephanie Lanning to resign also. VanNahmen asked us to give to Stephanie Lanning started to walk towards the math science building. I then had to ask VanNahmen if he read what was in the letter and reminded him he was only allowed to be on campus to attend class and take his final and he had about an hour and a half before the class was to start. VanNahmen got back

<div align="center">41:30</div>

in his car and left.

Okay and did you ever see a copy of the resignation letter that he had drafted out when he was in student services?

I remember glancing at it wasn't prior to-

Does that look like it?

Yes that's it.

Okay. Mr. VanNahmen I just wanted to

<div align="center">42:00</div>

double-check, is that the resignation letter that you drafted?

Yes it is.

I'm sorry I didn't hear.

<div align="center">**17**</div>

Yes it is.

Okay thank you.  Okay is there anything else that you would like to add?

That's it.

Does anyone on the panel have questions for Steven Sites?

<center>42:30</center>

Okay and we did note for the record that you're serving as your capacity in your part time position for Dodge City Community College security officer security coordinator is that your title?

Yes ma'am.

I appreciate you rushing to get here on time cause I know you just came off duty with your other employment okay.

Yes ma'am.

Alright next up will be Josh Thompson security director.

<center>43:00</center>

Go ahead and read your information into the record.

On December 8th 2016 at approximately 0830 hours I Josh Thompson director of security for the Dodge City Community College was made aware by telephone that Lyle VanNahmen had returned to the student union.  Bev Temaat informed me that the security coordinator Steven Sites had intercepted Mr. VanNahmen who was attempting to meet with college president Dr. Nolte to demand his resignation for a second time.  After this incident I installed new procedures to protect Dr. Nolte until Mr. VanNahmen was issued his letter of criminal trespass

<center>43:30</center>

from the college.  The procedures that changed were as follows:  I moved my desk from the res life maintenance building to the lobby of Dr. Nolte's office.  A security vehicle was at all times parked outside of Dr. Nolte's office to maintain a visual presence.  A lockdown procedure is in place if Mr. VanNahmen is seen on campus to protect Dr. Nolte.  The lockdown procedures are: locking the lobby door and the entry door to Dr. Nolte's office.  Placing a security officer at Dr. Nolte's office.  Sending the remaining security personnel

<center>44:00</center>

out to find and remove Mr. VanNahmen from the campus if he was in violation of his criminal

<center>**18**</center>

trespass notification.

Okay is there anything else you would like to add?

No.

Any questions for security director Josh Thompson?  Okay hearing none thank you.

Okay Mr. VanNahmen I had spoken with you earlier about the three really the

<div align="center">44:30</div>

parts of the hearing and I told you that there was one of them that I considered to be the most important and that's the part of the hearing where you have an opportunity to tell your side of the story, and you have an opportunity to ask questions of the witnesses that have provided evidence, and that

(background noise)

Absolutely.  Okay we'll stop the hearing at 2:07pm go ahead.

<div align="center">45:00</div>

Alright it's 2:12 pm and we're resuming the hearing for Lyle VanNahmen we had taken a break at the request of Mr. VanNahmen so that he could confer with his advisor Mr. Peter Antosh.  Okay as I had said before Lyle this is the most important part of the hearing your opportunity to

<div align="center">45:30</div>

tell this hearing panel your side of the story what you think is important for them to know as they make a final decision related to your status as a student so it is very important.  So go ahead and take as long as you would like.

Well I had some questions I guess.

Okay.

So I was gonna ask a question of Harold president Harold Nolte there I guess I was gonna ask "what is your job title?"

Okay you want to ask him

<div align="center">46:00</div>

questions as a witness.  Okay you want to come back up here.

<div align="center">**19**</div>

It's president of Dodge City Community College.

And are you directly or indirectly the boss of the panel members that are hearing this action?

Yes.

Yes you okay.  Are you directly or indirectly the boss of the judicial officer Beverly Temaat?

Yes.

<div align="center">46:30</div>

Do you allege that I cursed at you?

Pretty strongly but not cursed, you didn't curse, but you were very strong with your conversation with me.

Do you allege that I yelled at you?

Yes.

Do you allege that I physically assaulted you?

No.

Do you allege that I threatened you?

Yes.

Did you

<div align="center">47:00</div>

make a written statement about my incident you had with me?

Yes.

Did I leave your office peacefully?

Upset but yes.

I left peacefully yes.

I have some questions for Carla Patee.

Okay thank you Mr. President.

<div align="center">**20**</div>

No problem.

47:30

Carla good afternoon.

Hello.

Hello yes you were the secretary down there yes?

Yes.

Okay okay.  And what is your job title?  You are the secretary yes.  Is your job duties-

Executive assistant to the president, board clerk, freedom information officer.

Is President Nolte your boss?

Yes.

Yeah okay did you believe it would be bad

48:00

for your career if you contradicted him?

No.

When I met with President Nolte in his office did you hear yelling?

I don't recall that.

Okay okay so then when I met with President Nolte in his office did you hear me curse and  you said you didn't so that's irrelevant.

The door was closed so...

Did I enter President Nolte's office without permission?

No the door

48:30

is always open.

Okay did I have to be escorted out of President Nolte's office?

No.

Okay thanks.

Is that all for me?

Thank you, yes.  And for you're Keith Thomas apparently you're Josh...

Okay Keith Thomas he's not-

Keith Thomas is out of state and-

He's not here he's not available no.

<div align="center">49:00</div>

Mr. Sites okay.

What is your job title you-

Security coordinator.

Okay. What are your job duties?

My job duties is securing the campus making things peaceful making everything everybody's alright.

Is President Nolte

<div align="center">49:30</div>

your boss?

Yes.

Okay.  Do you believe it would be bad for your career if you contradicted him?

No.

Were you working at working at DCC3 DCC3 on December the 5th of 2016?

I can't remember if I was.

Okay.  When did you first hear that there may be an incident between me and President Nolte on December the 5th 2016?

<div align="center">**22**</div>

I believe it was on the seventh,

<p style="text-align: center; color: red;">50:00</p>

or, my dates could be wrong Lyle.

What did Josh Thompson say that I did on December 5th 2016 what did he say?

We were just having conversation I've read that in in the report it's all in the report but if you'd like me to read it again its all in there.

What's your version of it?

Exactly what I've put on here.

Was I rude to you?

<p style="text-align: center; color: red;">50:30</p>

You've never been rude to me Lyle.

Did I make any threatening statements?

Not to me.

Did you witness me behaving inappropriately?

I mean explain to me what you want-
At the time do you think I did anything inappropriate?

I thought it was weird that you were wanting the resignation.  There's steps to take I thought you handled it different than what a

<p style="text-align: center; color: red;">51:00</p>

normal normally you would do by going to the board.

Did I comply with all of the requests that you made to me?

You sure did.

Did you ask me to leave the student union no you never asked me I got this-

Yeah I was just gonna say just in the parking lot.

You had requested that I left and I did comply right away I did whatever

<p style="text-align: center;">**23**</p>

<div align="center">51:30</div>

you asked right away thank you.

Yeah.

Thank you.

I'm gonna have to leave do you have anything else?

Thank you. Sorry. Is there any hearing panel that have a question for Officer Sites? Okay. Okay we'll note for the record at 2:18pm Officer Sites had to leave the hearing. Okay please continue Lyle.

You're Josh Thompson yes okay.

<div align="center">52:00</div>

Very good okay. What is your job title I guess?

Director of security.

Director you're the and your job duties are?

Run the security department.

Okay. Is president Nolte your boss?

That's correct.

Do you believe that it is bad for your career if you contradicted him?

No I do not.

What is your understanding that I did wrong on December 5th 2016?

You scared the president I

<div align="center">52:30</div>

didn't have any direct dealings with you so I can't speak to it. It's just what you told the-

Right. Where did you get your information about what I did on December the 5th?

I don't recall.

<div align="center">**24**</div>

You don't recall.

It was over the phone but I don't remember who I got it from.

What security procedures did you put in place to protect?

<center>53:00</center>

Do you want me to read them again?

No I guess just asking off the top of your head.

That's the ones I read.

Were these procedures your idea?

Yes.

I guess Stephanie Lanning that I haven't asked you, thanks.  What is your job title?

<center>53:30</center>

I'm the dean of students.

Okay and your job what are your job duties?

I oversee student services responsibilities admissions financial aid records and at that time of the incident I was over housing and security, not security, conduct student conduct.

Okay.  Is President Nolte your boss?

Yes.

Do you believe it would be bad for your career if you

<center>54:00</center>

contradicted him?

No.

You and I discuss the possible land sale on December 5th 2016?

Yes.

Did I make any threats during our conversation?

<center>**25**</center>

No.

Did you tell me that if I wanted to speak to President Nolte about it that I should schedule an appointment with Carla Patee?

Yes.

Were you were you concerned at that time that I was

<div align="center">54:30</div>

that if I set a meeting with President Nolte that I was going to behave inappropriately there?

No.

So you didn't know?

On December 5th Monday December 5th no.

When were you informed that I had requested President Nolte resign immediately for his involvement in the land sale?

<div align="center">55:00</div>

I was notified on Friday December 9th at 8am by Beverly Temaat vice president of student affairs.

What date was that again?

Friday December 9th.

9th okay.

At 8am.

Okay.

Who notified you, Bev?

Bev yeah, Bev Temaat.

Were you directed to take any action against me at that time?

As the dean of students

<div align="center">55:30</div>

<div align="center">**26**</div>

based on the behavior misconduct that I had heard about I temporarily trespassed you campus wide as my responsibility as the dean of students.

What day are you saying that was?

My actions I started my actions at that time I wrote the letter and the letter was to be delivered to you on December 10th.

But I got it on the 12th.

Correct.

Yes I got it on the 12th.

So procedures when after the dean of students is I write the letter

<p style="text-align:center; color:red;">56:00</p>

I deliver it to security to deliver to the students.

Okay I talked to you on the 12th that day right yes you and I visited on the 12th you and I came into your office and visited with you on the 12th that afternoon correct?

I don't recall that meeting.

I did you say you wrote on Friday the 10th and you and I visited on the 12th in your office that Monday and then Sites give it to me 45 minutes later.

<p style="text-align:center; color:red;">56:30</p>

I don't recall that meeting.

Okay you and I visited thank you. What investigation did you undertake before issuing the trespass order against me?

I saw a copy of the letter where you requested Dr. Nolte's resignation and I also was verbally told of the communication that you had with Dr. Nolte on that Monday.

<p style="text-align:center; color:red;">57:00</p>

Did you speak directly with Dr. Nolte about the situation before issuing the trespass order?

Yes.

Okay can I ask you why you didn't say anything to me on Monday when I sat and visited with you that day?

<p style="text-align:center;">**27**</p>

Because I didn't know if it had been delivered or not and you didn't state anything and I didn't have the official letters in front of me because they were in the possession of security

<div align="center">57:30</div>

to deliver them to you and I don't recall this meeting that we had.

On the 12th Monday.  Yes that was right before the board meeting correct I asked you about the board meeting on Monday I walked in and you said you'd removed the board meeting from Tuesday to Monday on that Monday and you and I sat and visited and you told me twice that the board meeting had been moved from Tuesday to Monday that evening it was about 4:30 when I visited with you.

Okay I don't recall that meeting.

<div align="center">58:00</div>

Sorry.

Well it was a nice visit you're very nice to visit with thank you very well you do fine I apologize if I caused you any problem and under what authority did you issue the trespass order?

As the dean of students and as my job responsibilities at the time and also written in the student handbook it was my responsibility as the dean of students to authorize.

Okay I'd appreciate it if you had verbally told me something at the time I will

<div align="center">58:30</div>

say that I wish you had or something I think you would have been very appropriate.

Okay.

Thank you very nice, thank you thanks.

Okay thank you Lyle is there anyone else that you would like to ask a question?

No.

You think that got through them all.  Thank you.  Okay and the floor is still yours if you'd

<div align="center">59:00</div>

like to make a statement or anything you think is important to point out for the hearing panel members to consider.

<div align="center">**28**</div>

I'm

<p align="center" style="color:maroon">59:30</p>

I'm good Bev.

Okay and I appreciate your cooperation.

Thank you. Thank you.

Thank you.

Is there anything that the hearing panel members would like to ask at this time?

I would.  Can you tell us a little bit more about the incident like from your own perspective? Because you were talking and all that like I'm getting a picture of what you were experiencing at the time but you didn't really say like what kind of wordage did you use with President Nolte you asked

<p align="center" style="color:maroon">1:00:00</p>

him about how he perceived of the interactions so if you wouldn't mind kind of describing the interaction to me from while you were experiencing it, does that make sense?

I understand what you're saying and I'm gonna read this statement at this time.

I am exercising my right to not answer questions.  According to the student handbook the student charged may be questioned only if testifying in his or her own behalf, examination of witnesses by the person charged does not constitute testimony

<p align="center" style="color:maroon">1:00:30</p>

on one's own behalf.  I will not be testifying in my own behalf although I'd like to make a non-testimonial closing statement.

Okay alright so are you ready or comfortable making your statement at this point or do you want to confer with your adviser or anything like that?  Please proceed.

Okay my closing statement is I have a number of points that I'd like to make.

<p align="center" style="color:maroon">1:01:00</p>

I do not believe this tribunal can impartially conduct this hearing because everyone here is beholden to President Nolte the chief complainant against me.  My understanding is that I was pre-judged guilty of misconduct and the purpose of today's hearing is to mitigate punishment.  Going into this hearing I have not been made aware of what type of punishment I am likely to face if I am found guilty of misconduct.  I have not been permitted to have members of the public here even though

<p align="center">**29**</p>

I have through my attorney

<center>1:01:30</center>

requested that this hearing been open to the public.  My attorney has not been permitted to participate in my hearing.  I have not been provided a clear statement of what I am accused of doing wrong.  I expressed myself peacefully, which is my constitutional right, and I have been penalized for doing so.

Okay a couple of points that I would like to make that are prevalent in our

<center>1:02:00</center>

code of conduct are on page 82 under the word "record" there is another heading that says "closed hearing: the college reserves the right to close conduct review hearings to anyone other than persons approved by the judicial hearing board" so we did exercise that within the code of conduct and that's why the hearing is closed.  And just so you know I'm never aware of a conduct review hearing that has occurred on this campus

<center>1:02:30</center>

that has been open to the public.  I don't think that's ever occurred and it is standard practice on a college campus that conduct hearings are typically closed so I was going to make that note.  And the other thing that I wanted to let you know is that in the code of conduct there is a whole range and parameter of sanctions

<center>1:03:00</center>

that can be issued on either a temporary basis or a permanent basis and those are all outlined in the code of conduct.  So if you're wondering what possible sanctions could be instated on a permanent basis they are outlined throughout the code of conduct and you do have a copy correct?  You have a copy of the code of conduct?

I have a handbook.

Yes the code of conduct is in the handbook

<center>1:03:30</center>

and it begins on page 77 and the sanctions are listed within that.  Okay anything else that you would like to add?  Okay the next phase is the hearing panel will go into deliberations and the deliberations are closed and we'll try to have a decision on their part.  I can't tell you exactly how long it will take but we'll try to do it as quickly as

<center>1:04:00</center>

<center>**30**</center>

possible and their decisions will be communicated to you in writing so you'll get a written letter that most likely will be presented to Mr. Antosh so that he can share that with you, okay?   Alright anyone else have anything that they would like to say?

Hearing done we will end the hearing at 2:31 pm.  Thank you all.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

LYLE VANNAHMEN                                              *Plaintiff,*

    *vs.*                                              Case No. 17 CV 1174

DODGE CITY COMMUNITY COLLEGE                  *Defendant.*

AFFIDAVIT OF PLAINTIFF LYLE VANNAHMEN

STATE OF KANSAS
             ss:
COUNTY OF FORD

    I Lyle Vannahmen, of lawful age, first duly affirming, under penalty of perjury, depose and state that:

1.    I am the plaintiff in this action.

2.    I was made to understand that Dodge City Community College had instituted disciplinary proceedings against me as to my conduct on December 5, 2016 and December 8, 2016.

3.    However I was never notified as to specifically what I did that caused offense.

4.    I believe I faced discipline by Dodge City Community College because School President Harold Nolte did not like my opinion and did not like my demeanor.

5.    It has never been explained to me by anyone what I allegedly did that caused me to be punished with four years of suspension from Dodge City Community College.

6.    The only written communication I received from Dodge City Community College regarding what I did that caused me to be subjected to four years of suspension was too vague for me to understand.

7.    The document I received from Dodge City Community College advising me of my four year

**32**

suspension did not indicate what actions I took that caused offense.

8.  The document I received from Dodge City Community College advising me that the suspension was affirmed also failed to advise me of what actions I took that caused offense.

9.  I was not made aware of the composition of my disciplinary hearing panel prior to the hearing.  This made me question the legitimacy of the hearing.

10.  I was not made aware of the identity of the person who would be hearing my appeal in the event of an adverse panel decision.  This made me question the legitimacy of the potential appeal.

11.  I was advised that I would not have the right to compel the appearance of Harold Nolte or Stephanie Lanning, allegedly complaining witnesses against me, at the hearing.  This made me question the legitimacy of the hearing.

12.  I was advised my attorney would not be permitted to conduct direct or cross-examination of witnesses.  This made me uncomfortable as I would have preferred that he handle these duties.

13.  I was not permitted to have my hearing in public.  I would have liked to invite the media, so that they could gain insight into the way Dodge City Community College operated, but I was told prior to the hearing that no members of the public or media would be allowed in.  For these reasons I do not know who would have come had I invited them, since I did not have the opportunity to do so.

14.  I do not know what goes on in Harold Nolte's head so I cannot say one way or the other whether or not he felt frightened by me.  All I can speak to are my actions and I deny that I did anything to threaten him.

15.  An incident that was referenced regarding my "threatening behavior" involved my alleged

closing of the blinds in Nolte's office (as though I was trying to intimidate him or doing something sinister.) The hearing testimony indicated that President Nolte was the one who closed the blinds. It is like small-town gossip that takes on a life of its own. This is the reason that I have been so adamant about finding out what things I actually did that were perceived as being wrong.

16. The delay in the drafting of the initial hearing order and its mailing, along with the fact that I was offered a "mitigation meeting" with DCCC Vice President Bev Temaat (not the hearing panel) made me question the legitimacy of the hearing process. It made and makes me believe that regardless of what the hearing panel determined, the school's administration would have the ultimate say.

17. In my lawsuit I requested that the Federal Court exercise judicial review, same as a Kansas court would if I had filed my lawsuit in state court rather than federal court.

18. My complaint against the composition of the hearing panel was not just that I knew its members would be affiliated with or employed by the school. It is that it would be comprised of people that would have to make a decision regarding the credibility of their boss.

ATTEST:

Lyle VanNahmen
Plaintiff

Subscribed and sworn to before me on this 26th day of September 2018.

Notary Public

My Commission Expires: 09|01|2019

DINA ACOSTA
Notary Public - State of Kansas
My Appt. Expires 09|01|2019

**34**

Page 180

| | | | |
|---|---|---|---|
| 1 | A | That was not true, though. | 03:45PM |
| 2 | Q | Didn't ask you that. | 03:45PM |
| 3 | A | Okay.  Well -- | 03:45PM |
| 4 | Q | You understood going into the hearing that the | 03:45PM |
| 5 | | purpose was to find out if that was true.  The board | 03:45PM |
| 6 | | was going to hear the evidence and determine whether | 03:45PM |
| 7 | | it was true; correct? | 03:45PM |
| 8 | | That was the purpose of the hearing, | 03:45PM |
| 9 | | wasn't it? | 03:45PM |
| 10 | A | The purpose of the hearing -- | 03:45PM |
| 11 | Q | Was to hear the evidence on what your conduct was or | 03:46PM |
| 12 | | was not on December 5th and December 8th of 2016; | 03:46PM |
| 13 | | correct? | 03:46PM |
| 14 | A | To hear the evidence, yes. | 03:46PM |
| 15 | Q | All right.  And you knew that some of that evidence | 03:46PM |
| 16 | | was going to be what's contained in Exhibit 7; | 03:46PM |
| 17 | | correct? | 03:46PM |
| 18 | A | But you're calling it evidence, but it's not really | 03:46PM |
| 19 | | evidence.  It's just fabricated.  Okay. | 03:46PM |
| 20 | Q | You knew, sir, that some of the evidence that was | 03:46PM |
| 21 | | going to be presented at the hearing -- | 03:46PM |
| 22 | A | Yes. | 03:46PM |
| 23 | Q | -- was going to be Exhibit 7? | 03:46PM |
| 24 | A | Yes. | 03:46PM |
| 25 | Q | And the testimony of those witnesses; correct? | 03:46PM |

Page 181

| | | | |
|---|---|---|---|
| 1 | A | Could be, yes. | 03:46PM |
| 2 | Q | All right.  Did you know who the panel members were | 03:46PM |
| 3 | | before the hearing?  Did you get a list of them? | 03:47PM |
| 4 | A | No, I didn't. | 03:47PM |
| 5 | Q | You know if your attorney did? | 03:47PM |
| 6 | A | I don't know. | 03:47PM |
| 7 | Q | When you walked into the hearing panel, did you | 03:47PM |
| 8 | | recognize any of the people in the room, besides | 03:47PM |
| 9 | | your wife and your attorney? | 03:47PM |
| 10 | A | I recognized Bev.  She was there. | 03:47PM |
| 11 | Q | Okay.  Anyone else that you recognized? | 03:47PM |
| 12 | A | Bev ran the hearing.  I recognized her. | 03:47PM |
| 13 | Q | Anyone else that you recognized?  Did you recognize | 03:47PM |
| 14 | | any of the panel members? | 03:47PM |
| 15 | A | No. | 03:47PM |
| 16 | Q | How many were there? | 03:47PM |
| 17 | A | Three, it seems. | 03:47PM |
| 18 | Q | Do you know who Margarita Morales is? | 03:47PM |
| 19 | A | Do I know who she is? | 03:47PM |
| 20 | Q | Yeah. | 03:47PM |
| 21 | A | No. | 03:47PM |
| 22 | Q | Do you know where she works? | 03:47PM |
| 23 | A | No. | 03:47PM |
| 24 | Q | Do you know who her supervisors are? | 03:47PM |
| 25 | A | No. | 03:48PM |

Monday, December 5:

Mr. Lyle Van Nahmen entered Carla's office and asked to speak with Dr. Nolte. (He had come to the office prior, but Dr. Nolte was in a meeting and not available.)

Dr. Nolte met with Mr. Van Nahmen in the President's office.  Mr. Van Nahmen asked Dr. Nolte to lower the blinds in the office.

After some small talk about Spearville – Mr. Van Nahmen asked "Whose stupid idea is this retail development?"

Dr. Nolte replied, "The idea came from the City and developers and I presented this information to the Board.

Mr. Van Nahmen said "The Board is old and stupid – if this is your idea, you need to resign."  (He asked for Dr. Nolte's resignation more than one time.)

Dr. Nolte replied "I'm not going to resign".

Mr. Van Nahmen got up and left the office.

Dr. Nolte immediately asked Mr. Keith Thomas to come to the office area and relayed this story to Mr. Thomas and Carla Patee.



Deposition
Exhibit 7

cf

**37**

Monday, December 5

Mr. Lyle Van Nahmen entered my office and asked to speak with Dr. Nolte. Dr. Nolte was in a meeting in his office and not available.  Mr. Van Nahmen said that he needed to run upstairs and would be back.

Mr. Van Nahmen returned later and waited for Dr. Nolte.

Dr. Nolte met with Mr. Van Nahmen in the President's office with the door closed.

The President's door opened and Mr. Van Nahmen left – Dr. Nolte was noticeable shaken and immediately went to find Mr. Thomas.  Both were in my office and Dr. Nolte relayed the information below to us.


**Information relayed to me and Mr. Thomas by Dr. Nolte after Mr. Van Nahmen left:**

Dr. Nolte told me later that Mr. Van Nahmen asked him to lower the blinds in the office.

After some small talk about Spearville – Mr. Van Nahmen asked Dr. Nolte "Whose stupid idea is this retail development?"

Dr. Nolte replied, "The idea came from the City and developers and I presented this information to the Board.

Mr. Van Nahmen said "The Board is old and stupid – if this is your idea, you need to resign."  (He asked for Dr. Nolte's resignation more than one time.)

Dr. Nolte replied "I'm not going to resign".

Mr. Van Nahmen got up and left the office.

Dr. Nolte immediately asked Mr. Keith Thomas to come to Carla's office area and relayed this story to Mr. Thomas and Carla Patee.




Carla Patee

March 3, 2017


**38**



# DODGE CITY COMMUNITY COLLEGE
### and AREA TECHNICAL CENTER

2501 North 14th Avenue • Dodge City, Kansas 67801 • www.dc3.edu • (620) 225-1321 • 1-800-367-3222

EXHIBIT F

May 2, 2017

Lyle VanNahmen
Student ID # 605920
206 N. Main
Spearville, KS 67876

Lyle VanNahmen:

This letter is to confirm in writing the final disposition of the conduct review hearing that took place in the Student Union Ford County Room at Dodge City Community College (DCCC) on Tuesday, April 25th, 2017. Your conduct and behavior on the campus during the end of the fall 2016 semester violated the DCCC Code of Conduct. Specifically, you *"exhibited behavior that threatened harm to college employees"* and "*conducted yourself in a disorderly manner*" causing the college and several employees to take action and alter normal operations for safety reasons. Furthermore, your actions demonstrated "*threatened interference"* and "*intimidation"* towards college employees who were fulfilling normal work responsibilities. **Based on your failure to comply with the Code of Conduct, the following action is being taken:**

1. **Effective immediately, you are suspended from Dodge City Community College for a period of approximately four years (until December 31st, 2020). You are no longer permitted to continue your academic classes at Dodge City Community College.**

2. **Effective immediately, during the approximate four year suspension period, you are trespassed from all areas of the Dodge City Community College Campus. Trespass entails that you not be in any building, on college property, or at any College sponsored event (including athletic events or activities on or off campus) at any time, for any reason. If you are observed in any of the buildings, on the property, or at an event or activity, our security staff will be called and you may be subject to immediate removal from campus and arrest for criminal trespass (pursuant to K. S. A. 21-3721 and other applicable statutes). Specifically, DCCC security will notify law enforcement officers from the Dodge City Police Department or the Ford County Sheriff's office that you are violating a trespass sanction and you may be subject to immediate arrest for trespass.**

3. **If, at any time after December 31st, 2020, you would like to re-enroll as a student, you should first make arrangements at your own expense, to receive an assessment from an approved, licensed Counseling professional related to interpersonal relationships, difficulties dealing with persons of authority, and anger management issues specific to your conduct on campus during the fall 2016 semester. You should provide the results of such assessment to college officials to determine the conditions**



# DODGE CITY COMMUNITY COLLEGE
### and AREA TECHNICAL CENTER

2501 North 14th Avenue • Dodge City, Kansas 67801 • www.dc3.edu • (620) 225-1321 • 1-800-367-3222

**and requirements related to approval for re-enrollment. You should also abide by all recommendations arising from such assessment and provide a release of information that permits your counselor to discuss your assessment and/or treatment (if required) on a continuing basis with appropriate college officials.**

Mr. VanNahmen, you have certain rights related to this suspension and trespass sanction. Please review the information found in the Code of Conduct in the Calendar/Handbook that was previously provided to you and your advisor (attorney). Specific instructions related to your rights are contained on page 82 of the Dodge City Community College 2016-2017 Calendar/Handbook. If you have any further questions, please ask your advisor (Peter Antosh) to contact Vice President Temaat at 620.227.9204 or Glenn Kerbs, College Attorney at 620.225.0238.

Sincerely,

Beverly Temaat
Vice President of Student Affairs & Risk Management


C: Glenn Kerbs, College Attorney
   Judicial Conduct Office

**40**

order is further indication that the proceedings were a farce.

### COUNT II:  VIOLATION OF FREEDOM OF SPEECH

21.    DCCC, a state actor, penalized plaintiff, depriving him of liberty and or property, for

expressing his opinion on a topic of public concern.

### COUNT III: JUDICIAL REVIEW

22.    This matter having been fully adjudicated at the administrative level, plaintiff asks that this

Court exercise judicial review over DCCC's student disciplinary proceedings involving him.

### PRAYER

WHEREFORE plaintiff respectfully prays this Court enter judgment in his favor in an

amount in excess of $75,000.00, that it vacate all adverse rulings made against him by DCCC and

its agents, for his costs and fees, for attorney fees as vouched, for pre- and post-judgment interest

as may be applicable, and for any and further relief as the Court may deem just and equitable in the

premises.

8

Page 185

| | | | |
|---|---|---|---|
| 1 | A | I have reservations about it. | 03:52PM |
| 2 | Q | Do you have any -- what are your facts?  What facts | 03:52PM |
| 3 | | do you have that indicate any of these panel members | 03:52PM |
| 4 | | or the reviewing administrator were not impartial | 03:52PM |
| 5 | | other than the fact that they were all employed by | 03:53PM |
| 6 | | the college? | 03:53PM |
| 7 | A | You're saying the president is not their boss? | 03:53PM |
| 8 | Q | I'm not saying anything.  I'm asking a very simple | 03:53PM |
| 9 | | question. | 03:53PM |
| 10 | A | Well, I asked you -- | 03:53PM |
| 11 | Q | My question is very simple.  I understand from your | 03:53PM |
| 12 | | lawsuit that you allege that these people could not | 03:53PM |
| 13 | | be impartial because they were employed by the | 03:53PM |
| 14 | | college and the president of the college was -- was | 03:53PM |
| 15 | | the chief witness.  I got that. | 03:53PM |
| 16 | | I'm just trying to find out if there's any | 03:53PM |
| 17 | | other reason you think these people were impartial. | 03:53PM |
| 18 | | I just need to know what your claim is.  I'm not | 03:53PM |
| 19 | | suggesting there is anything else.  I'm not | 03:53PM |
| 20 | | suggesting that what you said isn't sufficient. | 03:53PM |
| 21 | | I'm just trying to find out if you've got | 03:53PM |
| 22 | | any other evidence that the panel members or the | 03:53PM |
| 23 | | reviewing administrator were not impartial, other | 03:53PM |
| 24 | | than the fact that they work for the college? | 03:53PM |
| 25 | A | Well, I explained to you I don't know those people | 03:53PM |

```
                                                  Page 186
1        personally or what their situations are or anything,    03:54PM

2        but --                                                  03:54PM

3    Q   So the answer is no?                                    03:54PM

4    A   I'm not going to say no.                                03:54PM

5    Q   So is your answer yes?                                  03:54PM

6    A   I'm not going to say yes.                               03:54PM

7    Q   It's got to be one of the two.                          03:54PM

8            MR. GLENDENNING:  If you want to step in            03:54PM

9        and stipulate at any time, Mr. Antosh, I'll be happy    03:54PM

10       to take a stipulation that there's no other basis.      03:54PM

11           MR. ANTOSH:  We stipulate there's no other          03:54PM

12       basis.                                                  03:54PM

13           MR. GLENDENNING:  Very good.                        03:54PM

14   Q   (BY MR. GLENDENNING)  Were you prepared to examine      03:54PM

15       these witnesses in getting ready for the hearing?       03:54PM

16   A   Do I get to?                                            03:54PM

17   Q   Did you?                                                03:54PM

18   A   What?                                                   03:54PM

19   Q   Did you prepare to examine the witnesses at the         03:54PM

20       hearing?                                                03:54PM

21   A   My understanding is they needed to prove I did          03:54PM

22       something wrong.                                        03:55PM

23           MR. ANTOSH:  How about --                           03:55PM

24   Q   (BY MR. GLENDENNING)  That doesn't answer my            03:55PM

25       question.                                               03:55PM
```

In the Matter of )
**LYLE VANNAHMEN** ) DCCC Case No. 16-055
in Disciplinary Proceedings. )

### MEMORANDUM

**NOW** on this 24th day of March, 2017, the Parties meet for a pre-hearing conference. Dodge City Community College ("DCCC") is represented by counsel Glenn I. Kerbs. Respondent Lyle VanNahmen is represented by counsel Peter J. Antosh. Beverly G. Temaat is also present in her capacity as special judicial officer. There are no other appearances.

**WHEREUPON,** Respondent presents a number of demands regarding the pending disciplinary hearing, and each are determined as follows:

1.  Regarding Respondent's demand for additional discovery materials:

    DCCC indicates it will provide any additional materials responsive to Respondent's demand at least seven (7) days prior to the date of this hearing.

2.  Regarding Respondent's demand for assignment of hearing of this matter to an independent adjudicative body:

    DCCC denies the request. The Code of Conduct does not provide for assigning the hearing in a conduct matter to a third party. The Code of Conduct provides that conduct review hearings will be conducted so as to insure fairness to the student, which is what the College intends to do in this matter.

1

3.    Regarding Respondent's demand for an alternate appeal procedure in the event appeal is necessary so as to avoid review by the president of the college as he is the principal complainant against Respondent:

DCCC indicates any appeal shall be assigned to a College administrator.

4.    Regarding Respondent's demand that complainants be made available for questioning at the hearing:

DCCC indicates it will make Carla Patee, Keith Thomas, Steven Sites, and Josh Thompson available, and that it will ask Harold Nolte and Stephanie Lanning if they are willing to testify but will not require them to do so.

5.    Regarding Respondent's demand that his counsel be permitted to conduct direct and cross-examination of witnesses:

DCCC denies the request. The Code of Conduct allows the student to have an attorney or advisor present. The role of the attorney or advisor is limited to advising the student. The attorney or advisor may not directly question witnesses or the Judicial Hearing Board.

6.    Regarding Respondent's waiver of rights to a closed hearing and demand that his hearing be open to the public and that he be permitted to bring a court reporter and/or videographer:

DCCC denies the request but will permit Respondent to make an audio recording of the proceedings.

2

7. Regarding Respondent's demand that he be provided with more specific explanation of his alleged improper conduct:

> DCCC refers Respondent to the March 5, 2017, "charging document" which sets forth the violations of the Code of Conduct alleged by the College.

8. Regarding Respondent's demand that he be provided with notice of the penalties he may be subject to if found responsible for misconduct:

> The sanctions for violation of the Code of Conduct are found within the Code and set forth on pages 82-83 of the 2016-2017 Student Handbook.

9. Regarding Respondent's demand that his trespass order be immediately lifted:

> DCCC denies the request.

**APPROVED BY:**

Beverly G. Temaat
Special Judicial Officer
Dodge City Community College
2501 North 14th Avenue
Dodge City, Kansas  67801

Glenn I. Kerbs, #09754
Kerbs Law Office
1715 Central Avenue
P.O. Box 1473
Dodge City, Kansas  67801
Telephone:     (620) 225-0238
Facsimile:     (620) 225-0318
Email:         gkerbs@kerbslaw.com
College Attorney

3

**46**

Peter J. Antosh, 21334
Garcia & Antosh, LLP
1401 Central Avenue
Dodge City, Kansas 67801
Telephone:    (620) 225-7400
Facsimile:    (620) 225-4339
Email:        pja22@yahoo.com
Attorney for Respondent

4

**47**